IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Jimmy Dale Wright, | ) | Civil Action No. 8:14-cv-01329-DCN-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Civil Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB").  For the reasons set forth below, it is recommended that the decision of the Commissioner be  reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

In September 2010, Plaintiff filed an application for DIB, alleging an onset of disability date of September 1, 2010. [R. 156–159.]  The claim was denied initially and on reconsideration by the Social Security Administration ("the Administration"). [R. 131–140, 146–147.]  Plaintiff requested a hearing before an administrative law judge ("ALJ") and on

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

November 13, 2012, ALJ Alice Jordan conducted a de novo hearing on Plaintiff's claim. [R. 76–130.]

The ALJ issued a decision on January 18, 2013, finding Plaintiff not disabled. [R. 22–41.] At Step 1,[2] the ALJ found Plaintiff met the insured status requirements of the Social Security Act ("the Act") through December 31, 2015, and had not engaged in substantial gainful activity since September 1, 2010, the alleged onset date. [R. 27, Findings 1 & 2.] At Step 2, the ALJ found Plaintiff had the following severe impairments: back disorder, schizoaffective disorder, and obsessive-compulsive disorder ("OCD"). [R. 27, Finding 3.] The ALJ also found Plaintiff had non-severe impairments of hypertension and high cholesterol. [R. 27.] At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 28, Finding 4.] The ALJ specifically considered Listings 12.04 and 12.06 with respect to Plaintiff's mental impairments but did not specifically address a particular listing with respect to Plaintiff's back impairment. [R. 28–29. ]

Before addressing Step 4, Plaintiff's ability to perform his past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c). Additionally, the claimant can perform unskilled work with no more than occasional interaction with the public and no more than frequent interaction with coworkers.

---

[2]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

> Otherwise, he can perform simple, routine and repetitive work
> for two-hours at a time for an eight-hour workday.

[R. 29, Finding 5.]  Based on this RFC finding, the ALJ determined at Step 4 that Plaintiff was unable to perform his past relevant work as a school bus driver and a plate mounter in a print shop.  [R. 33, Finding 6.]   Based on his age, education, work experience, RFC, and the testimony of a vocational expert, however, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  [R. 34, Finding 10].   On this basis, the ALJ found Plaintiff had not been under a disability as defined by the Act from September 1, 2010, through the date of the decision.  [R. 35, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision but the Council declined.  [R. 1–6.]  Plaintiff filed this action for judicial review on April 12, 2014.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and that remand is necessary for the following reasons because the ALJ improperly discounted Plaintiff's credibility based on a failure to comply with treatment without taking into account his inability to pay and failed to explain how notations of improvement of an unspecified amount were inconsistent with Plaintiff's testimony indicating disability.  [Doc. 15 at 21–26.]. Plaintiff also contends the Appeals Council erred in failing to remand the ALJ's decision in light of new and material evidence provided by Plaintiff.  [*Id*. at 17–21.]

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence and that the ALJ conducted a full credibility evaluation, in which Plaintiff's treatment non-compliance and treatment notations of improvement were only two

3

factors in determining his credibility.  [Doc. 17 at 16.]  The Commissioner also argues that

the Appeals Council properly considered Plaintiff's new evidence, a letter from Dr. Martin

dated April 5, 2013, and found the information did not provide a basis for changing the

ALJ's decision as it was neither new nor material.  [*Id*. at 12–16.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the

evidence must do more than merely create a suspicion of the existence of a fact and must

include such relevant evidence as a reasonable person would accept as adequate to

support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368

F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687

(S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning

mind would accept as sufficient to support a particular conclusion.  It consists of more than

a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is

'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a

claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the

[Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76

F.3d 585, 589 (4th Cir. 1996); *see also  Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th

Cir. 1991) (stating that where the Commissioner's decision is supported by substantial

evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"  *Vitek  v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."  *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence

or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).    Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision.  *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand.").  After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction.  *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

6

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[3] With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an

---

[3]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders'* construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

7

order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C.

§ 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period
> of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.     The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations

have reduced the statutory definition of disability to a series of five sequential questions.

*See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency"

in considering disability claims).  The ALJ must consider whether (1) the claimant is

engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the

impairment meets or equals an impairment included in the Administration's Official Listings

of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents

the claimant from performing past relevant work; and (5) the impairment prevents the

claimant from having substantial gainful employment.  20 C.F.R. § 404.1520.  Through the

fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699

F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day

of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A. *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 404.1572(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575.

### B. *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 404.1521. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that,

9

when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B).

## C.  *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d).

## D.  *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[4] with the physical and mental demands of the kind

---

[4]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a).

10

of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. § 404.1560(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[5] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations). When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines. *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work. 20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that

---

[5]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 404.1569a(a). A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. § 404.1569a(c)(1).

claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy."). The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50. For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

12

### III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 404.1527©.  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition

13

for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 404.1527(d).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. § 404.1517.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the

pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling

pain, the ALJ must proceed in a two-part analysis.  *Morgan v. Barnhart,* 142 F. App'x 716,

723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the

claimant has produced medical evidence of a 'medically determinable impairment which

could reasonably be expected to produce . . . the actual pain, in the amount and degree,

alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the

ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as

a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged

pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the

Fourth Circuit, it is well established that "subjective complaints of pain and physical

discomfort could give rise to a finding of total disability, even when those complaints [a]re

not supported fully by objective observable signs."  *Coffman v. Bowen*, 829 F.2d 514, 518

(4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ

must consider all of a claimant's statements about his symptoms, including pain, and

determine the extent to which the symptoms can reasonably be accepted as consistent

with the objective medical evidence.  20 C.F.R. § 404.1528.  Indeed, the Fourth Circuit has

rejected a rule which would require the claimant to demonstrate objective evidence of the

pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the

Commissioner to promulgate and distribute to all administrative law judges within the circuit

a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v.*

15

*Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the

following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms."  *Id.* at 34,485;

*see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

16

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

### Credibility

Plaintiff challenges the ALJ's credibility findings, arguing that the ALJ erred in discounting Plaintiff's claims of disability based on adverse inferences from Plaintiff's failure to comply with treatment recommendations and notations of improvement in the treatment notes.  [*See* Doc. 15 at 18–26.]  The Commissioner argues that Plaintiff's treatment noncompliance and treatment notations of improvement were only two factors in determining his credibility and that the ALJ properly identified various factors that she considered in determining that Plaintiff's claim for disability was not fully credible.  [Doc. 17 at 16.]

17

Whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96–7p, 61 Fed. Reg. at 34,485. The credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*; *see also Hammond*, 765 F.2d at 426 (stating that the ALJ's credibility determination "must refer specifically to the evidence informing the ALJ's conclusions").

The following is a nonexhaustive list of relevant factors the ALJ should consider in evaluating a claimant's symptoms, including pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication, received to relieve the symptoms; and (6) any measures the claimant has used to relieve the symptoms. 20 C.F.R. §§ 404.1529(c)(3). If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination. *Mastro*, 270 F.3d at 176 (holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency).

18

**Plaintiff's Medical History**

In his disability report, Plaintiff alleged that depression, nerves, panic attacks, and lower back problems limited his ability to work.  [R. 187.]  On or about September 1, 2010, Plaintiff presented to Khizar Khan, M.D. ("Dr. Khan") for treatment and management of mood symptoms of depression, anxiety, and panic disorder.  [R. 362.]  Plaintiff complained that he felt sad all the time, had problems with sleep, anhedonia, guilt, attention, and concentration.  [*Id.*] Plaintiff reported superficially cutting himself, but did not feel like he was a threat to himself.  [*Id.*]  On his mental status exam, Dr. Khan noted Plaintiff was oriented Xs 3; had fair grooming; was cooperative with fair eye contact; and was dysphoric, sad, passive, and withdrawn.  [*Id.*]  Dr. Khan diagnosed Plaintiff with major depressive disorder, single episode, moderate; panic disorder with agoraphobia; and a GAF score of 55.  [R. 362–363.] Dr. Khan noted that Plaintiff endorsed prominent symptoms of depression, anxiety, and panic attacks and had not started his trial pack of Celexa given by Dr. Melody Franks.  [R. 363.] Dr. Khan suggested Plaintiff consider Zoloft and take time off work for the next few days.  [*Id.*]

Plaintiff was seen again on September 8, 2010.  [R. 361.]  Plaintiff reported experiencing prominent gastrointestinal symptoms after starting Zoloft and was advised to stop the medicine and to monitor remission of the symptoms.  [*Id.*] Plaintiff also reported trying to return to work but being unable to do so due to anxiety symptoms.  [*Id.*] Plaintiff further reported ongoing and persistent panic attacks that were disabling and distressing and affected his ability to function and explained he feared losing his job now that he had a diagnosis of a psychiatric illness.  [*Id.*] Dr. Khan started Plaintiff on Remeron and gave

19

him time off of work, from September 8, 2010 until October 8, 2010, or until he is deemed stable to return to his employment.  [*Id*.]

On September 15, 2010, Plaintiff returned to Dr. Khan and reported that he had not filled his prescription for Remeron because he did not have any money until his paycheck. [R. 360.]  Dr. Khan advised Plaintiff to start the Remeron as soon as possible to achieve full advantage and remission of his mood symptoms.  [*Id*.]  Dr. Khan also advised Plaintiff that it was premature to conclude that he would be disabled and that he could not recommend him for long-term disability because Plaintiff had not followed treatment.  [*Id*.] Plaintiff saw Dr. Khan again on September 29, 2010 and noted that, after starting Remeron, his panic attacks had decreased, although he felt sleepy during the daytime and sometimes dizzy.  [R. 359.]  Dr. Khan excused Plaintiff from work until October 8, 2010, noting that if Plaintiff were to recognize remission of his symptoms completely and be able to go to work, he could do so on October 11, 2011; if not, Dr. Khan would extend his time off from work. [*Id*.]

Plaintiff was seen by Dr. Khan again on October 13, 2010.  [R. 358.]  Plaintiff presented quite distressed due to his experiencing persistent and more prominent panic attacks.  [R. 358.]  Plaintiff reported that he still felt dizzy and that he felt he was unable to function and had not returned to work.  [*Id*.]  Due to his poor response on Remeron, Dr. Khan started Plaintiff on Paxil and Ativan and extended his leave from work to November 8, 2010.  [*Id*.]  Plaintiff returned to Dr. Khan on November 16, 2010, reporting some response on his medications and reporting that, while he had many panic attacks the day before, "today is a better day."  [R. 388.]  Dr. Kahn advised Plaintiff to optimize his Paxil

20

dosage and changed his Ativan prescription to Klonopin due to poor response on Ativan. [*Id.*]  Dr. Kahn also extended Plaintiff's work leave until December 16, 2010.  [*Id.*]  On December 7, 2010, Plaintiff reported to Dr. Khan that the Klonopin was helping, although he still struggled with excessive anxiety and worries.  [R. 387.]  Dr. Khan advised Plaintiff to optimize his Klonopin dosage and to continue on his Paxil.  [*Id.*]  Dr. Khan also extended Plaintiff's leave from work until January 16, 2011.  [*Id.*]

Plaintiff was seen by Dr. Khan on January 5, 2011, noting that, while Plaintiff's medication appeared to be working, Plaintiff was not taking his Klonopin correctly in spite of being told how to use it for the best reaction and response.  [R. 386.]  Dr. Khan explained to Plaintiff that he was to take the Klonopin routinely and then take an extra dose in the middle of the day if needed, rather than take the Klonopin once the anxiety had started.  [*Id.*]  Plaintiff also reported that he got approved on his retirement from the school district, which was a "big load off his chest."  [*Id.*]  Plaintiff indicated he wanted to get better and find a different job in a different setting.  [*Id.*]

Plaintiff returned to Dr. Khan on February 23, 2011 reporting that he had been experiencing a lot of panic attacks and anxiety despite taking Klonopin three times a day, and that he was fearful of dying.  [R. 385.]  During Dr. Khan's discussion with Plaintiff, Plaintiff admitted he had not been taking his medication regularly and was "stretching it out" so that he did not run out before his appointment time; later in the discussion, Plaintiff explained he was not taking his medication because "he was afraid of them."  [*Id.*]  Dr. Khan discussed with Plaintiff his not being forthcoming and straightforward regarding his treatment and advised him to pursue treatment elsewhere.  [*Id.*]

On June 27, 2011, Plaintiff saw Dr. Ernest Martin ("Dr. Martin") for his depression and panic attacks. [R. 436.] After examining Plaintiff and his medical history, Dr. Martin diagnosed schizoaffective disorder and OCD. [R. 437.] Dr. Martin prescribed Paxil, Clonazepam, and Navane. [*Id*.] On July 18, 2011, Plaintiff was seen by Dr. Martin, and Plaintiff reported doing better on his current medication with decreased anxiety and paranoia and improving mood. [R. 435.]

Plaintiff was seen again by Dr. Martin in September and October 2011, complaining of problems sleeping, paranoia, and worrying about his mother's health. [R. 432–433.] Plaintiff complained he was worrying about dying and didn't feel safe when he went out of the house, and he was trying to move back in with his mother. [R. 432.] Dr. Martin added Abilify to his medications. [*Id*.] During his November 2011 visit, Plaintiff reported that he had stopped Abilify after two days due to nausea and diarrhea. [R. 431.] Plaintiff reported he was still worrying and obsessing, experiencing mood swings, and staying in bed a lot. [*Id*.] Dr. Martin added Cymbalta to Plaintiff's medications and switched Navane for Abilify. [*Id*.] Again, in early January 2012, Plaintiff reported feeling like he was going to die. [R. 430.] Dr. Martin increased Plaintiff's Navane. [*Id*.] In late January 2012, Plaintiff reported feeling jumpy on the increased dosage of Navane and reported that he was living with his mother. [R. 429.]

In February 2012, Plaintiff reported still feeling a little jumpy and having panic attacks, still feeling scared when alone, and worrying about his mother and her back surgery. [R. 428.] In April 2012, Plaintiff returned to Dr. Martin, complaining of having panic attacks at night. [R. 584.] Treatment notes indicate Plaintiff had been out of

medications and missed his appointment the previous month.  [*Id*.]  In May 2012, Plaintiff returned to Dr. Martin, complaining of anxiety at night.  [R. 583.]  Treatment notes indicate Plaintiff had not had his medications in a month.  [*Id*.]

On June 9, 2012, Plaintiff was admitted to AnMed Health, on referral from Dr. Martin, reporting hearing voices telling him to kill himself and depressive symptoms.  [R. 482.]  Treatment notes indicate Plaintiff had a prescription for Klonopin filled on June 1, 2012 for 60 tablets and, at the time of his admission, only had about 28 left; Plaintiff categorically denied abusing his medications.  [*Id*.]  His GAF score on admission was 30–35.  [R. 483.]  During his hospitalization, Plaintiff underwent individual, group, milieu activity and pharmacotherapies.  [R. 484.]  Subsequently, his mood improved, anxiety became better controlled, and his auditory hallucinations resolved completely; and there were no further paranoid ideations and no suicidal ideations or plans.  [*Id*.]  On June 19, 2012, Plaintiff returned to Dr. Martin, indicating that he was sleeping better and that he was no longer having worries or hallucinations.  [R. 582.]  Examinations in July and September 2012 indicate Plaintiff was doing better but complained of back pain.  [R. 580–581.]  Dr. Martin prescribed pain medication and discontinued Flexerol while he was taking Paxil.  [R. 580.]

On October 24, 2012, Dr. Martin wrote a letter at the request of Plaintiff's counsel at the time, stating that Plaintiff had been diagnosed with OCD and Schizoaffective Type Schizophrenia, Unspecified.  [R. 593.]  The letter states that Plaintiff's mental illness was considered severe and that Plaintiff had remained compliant with treatment recommendations with regard to keeping scheduled appointments and adherence to his medication regimen.  [*Id*.]

23

On April 5, 2013, Dr. Martin provided Plaintiff's current counsel a similar letter stating as follows:

> The above referenced individual Is being treated by me in private outpatient Psychiatric practice. His diagnoses are Schizoaffective Disorder and Obsessive Compulsive Disorder.

> At present time he is on medications to manage symptoms of his disorder which include overwhelming anxiety and panic as well as auditory hallucinations telling him to harm himself. He has ob[s]essive thought patterns related to fear of leaving his house and being in crowds of people with paranoia.

> As you can see his symptoms impact functioning in all areas of his life Including being gainfully employed. He has difficulty with focus and concentration, is easily distracted from tasks, and could present risk of harm to his self and others if he began hearing voices telling him to harm himself.

> In my opinion he is unable to perform job functions or be gainfully employed at this time. Any assistance you can provide him with his disability claim will be appreciated. Please feel free to contact me at 864-9506 if you have questions or I can be of further assistance.

[R. 8.]

### The ALJ's Credibility Determination

In making her credibility determination regarding Plaintiff's mental impairments, the ALJ explained as follows:

State agency psychological consultant Michael Neboschick, Ph.D., reviewed the record on November 12, 2010, and opined the claimant could understand and remember instructions; sustain attention for simple, structured tasks for periods of two-hour segments; and adapt to changes, particularly if they are infrequent and gradually introduced. Dr. Neboschick found the claimant could make work-related decisions; maintain appropriate appearance and hygiene; recognize and appropriately respond to hazards; work in the presence of others in uncrowded situations; and accept

24

constructive supervision. The doctor further stated the claimant would work best in uncrowded, structured, slow-paced situations that do not involve extensive direct, ongoing interaction with the public (Exhibit 6F). This opinion is largely supported by the record, including the treatment notes and the claimant's reported activities. Therefore, it is given great weight to the extent consistent with the record.

On December 1, 2010, treating general practitioner, Melody Franks, M.D., completed a form for the claimant's long-term disability claim with Standard Insurance Company.[6] Dr. Franks stated the claimant was diagnosed with major depressive disorder and panic disorder without agoraphobia. The doctor opined that the claimant was "unable to work at present" (Exhibit 10F). Dr. Franks did not specify how long she believed the claimant's impairments would preclude work. Additionally, she did not articulate any specific functional limitations caused by the claimant's alleged mental condition. Further, Dr. Franks is a general practitioner, not a mental health specialist. Accordingly, this opinion is given little weight.

At the reconsideration stage, State agency psychological consultant Frances Breslin, Ph.D., examined the record on March 12, 2012. Dr. Breslin opined the claimant could understand and remember simple and detailed instructions; follow simple and detailed instructions; complete work tasks without extra supervision; and attend to tasks for more than two hours as needed to complete simple and detailed tasks for completion of a typical 8-hour workday. The doctor stated that contact with peers should be casual and informal and there should be no intensive interaction with the public. He further opined the claimant could maintain attendance and schedules in the work setting; ask work related questions or for clarification of work tasks; interact appropriately with individual peers on an infrequent, casual basis in the workplace; accept direct and non-confrontational correction; adapt to routine changes in work demands or procedures; avoid hazards; travel independently; and make plans (Exhibit 19F). When viewed in light of the entire record, including the claimant's reported

---

[6]As Plaintiff pointed out, although the decision states Plaintiff's treating general practitioner provided this opinion, the form was actually completed by Plaintiff's treating psychiatrist Dr. Khizar Khan. [R. 390–391.]

activities and subjective complaints, this assessment is overly optimistic. Therefore, it is given little weight.

It should be noted that in a letter dated October 24, 2012, Dr. Martin stated that the claimant's level of mental illness was considered "severe" (Exhibit 25F). This letter is overly vague as the doctor did not define the term "severe" or articulate any functional limitations caused by the claimant's alleged impairments. Therefore, to the extent considered an opinion, the letter given little weight.

In addition, the claimant's mother submitted a Function Report that was supportive of the claimants' allegations of disability. The mother alleged limitations the claimant had on a daily basis with respect to his daily activities, social functioning, concentration, persistence, and pace (Exhibit 19E). These statements were considered in terms of understanding the severity of the claimant's impairments. However, the undersigned gives this opinion or indication as to the claimant's functional ability limited weight, because of its high degree of subjectivity, and lack of medically acceptable standards.

***

As for his mental impairments, there is evidence that the claimant has not been entirely compliant in taking prescribed medications. As detailed above, the claimant did not regularly refill his Paxil or Klonopin, causing Dr. Khan to discontinue treatment (Exhibits 5F and 9F).

When the claimant was compliant with his treatment, the record indicates his medication was effective in controlling his symptoms. He reported to Dr. Khan numerous times that his medication was helping. Further, as recently as June 19, 2012, the claimant stated he was feeling better and Dr. Martin noted the claimant showed improvement (Exhibits 5F, 9F and 24F). This evidence suggests that the symptoms may not have been as limiting as has been alleged in connection with this application and appeal.

The stated residual functional capacity is consistent with the undersigned's previous finding that the claimant has mild restrictions of activities of daily living, moderate restrictions on social functioning, moderate restrictions in concentration, persistence and pace and no episodes of decompensation.

26

As previously discussed, the claimant has numerous daily activities that highlight his independence, such as light cooking, doing laundry, and mowing the lawn. Additionally, he reported driving and having no problems with personal care or handling finances (Exhibits 4E, 19E and 20E). These activities indicate that he can perform unskilled, simple, routine and repetitive work, as required by the residual functional capacity.

The claimant reported difficulties with concentration and completing tasks (Exhibits 4E, 19E and 20E). These moderate difficulties in concentration, persistence, pace and adaptation to change are accounted for in the residual functional capacity as it only requires work in two-hour segments of time.

Further, despite allegations of panic attacks and difficulty getting along with others, the claimant reportedly lives with a roommate and sees his mother often (Exhibits 4E, 19E and 20E). This evidence suggests the claimant can have occasional interaction with the public and no more than frequent interaction with coworkers, in accordance with the residual functional capacity.

[R. 31–33 (footnote added).]

### Discussion

Plaintiff contends the ALJ made improper inferences regarding Plaintiff's noncompliance with treatment and failed to take into consideration his inability to pay for the prescribed medications. [Doc. 15 at 22.] While noncompliance with prescribed medical treatment is an important factor to consider in weighing a claimant's credibility, the analysis does not stop at whether the claimant did or did not comply with prescribed treatment. Additional issues to consider are whether (1) the claimant lacked funds to comply with treatment; (2) the claimant had good cause to decline treatment, such as the side effects of the medication; and (3) the claimant's impairments were reasonably remediable with adherence to the prescribed treatment. *Preston v. Heckler*, 769 F.2d 988,

27

990–91 (4th Cir. 1985); SSR 96–7p, 61 Fed. Reg. at 34,487.  Here, the ALJ addressed only one of the three factors outlined in *Preston* and concluded that Plaintiff's impairment was reasonably remediable with adherence to his medication regimen.  The ALJ, however, failed to conduct a particularized inquiry regarding the other two issues.  The record reveals that Plaintiff made a number of references to his inability to pay and/or his waiting for a paycheck before obtaining medication.  [*See, e.g.*, R. 360 (treatment record, noting Plaintiff did not get a prescription filled because he did not have any money until his paycheck); R. 571 (treatment record, noting Plaintiff did not get x-rays because his insurance would not cover them); R. 108 (Plaintiff's testimony that his mother and father help him pay for his medications); R. 113 (Plaintiff's testimony that he usually has appointments around the last working day of the month because his insurance does not cover visits).]  Further, Plaintiff's noncompliance appears to have occurred for a limited period of time, and his most recent treating psychiatrist indicates Plaintiff complies with his treatment regimen.  [R. 593.]  While Plaintiff's adherence to treatment was only one factor in weighing credibility, the ALJ failed to explain how Plaintiff's alleged lack of adherence for a period of time would overcome his allegations of disability even after a period of being in compliance with his psychiatrist's treatment plan.

Additionally, as mentioned above, the ALJ discounted Plaintiff's credibility based on references to improvement in his condition.  However, the ALJ failed to mention or explain her consideration of the numerous references to indications that Plaintiff's condition worsened, even while on his medications.  *See, e.g.*, R. 358 (treatment notes, indicating Plaintiff was having persistent and more prominent panic attacks); R. 387 (treatment notes, indicating Klonopin was helping but Plaintiff was still struggling with excessive anxiety and

28

worries); R. 388 (treatment notes, indicating Plaintiff was experiencing anxiety at night); R. 584 (treatment notes, indicating Plaintiff was having hallucinations at night with worsening symptoms); R. 585 (treatment notes, indicating Plaintiff was worried about dying); R. 587 (treatment notes, indicating Plaintiff was unable to go out a night by himself); R. 589 (treatment notes, indicating Plaintiff experienced interrupted sleep); and R. 590 (treatment notes, indicating worsening symptoms). Moreover, although the ALJ may reasonably base her credibility findings on Plaintiff's activities of daily living, her assessment of his activities appears to contradict some of Plaintiff's testimony. For example, the ALJ found Plaintiff could do light cooking, laundry, mow the lawn, drive, and handle his personal care and finances. [R. 28, 33.] Plaintiff testified, however, that he does not do his own laundry [R. 92]; he does not do any yard work or gardening or mow the lawn [R. 96]; he does not drive in traffic [R. 107]; and he drives about 25 miles per week with someone with him in the car [R. 108]. The ALJ provided no explanation in her decision of how she resolved these contradictions in the record.

The Commissioner argues that it is within the ALJ's discretion to weigh complaints against the medical evidence and reject them; however, the law requires that where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond*, 765 F.2d at 426. The ALJ may choose to reject a claimant's testimony regarding his pain or physical condition, but she must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y. Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).

29

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96–7p, 61 Fed. Reg. at 34,485–34,486. The ALJ failed to provide such reasoning in this instance. Because the ALJ failed to address the factors concerning Plaintiff's noncompliance with prescribed treatment, failed to explain how references to improvement in his condition outweighed his allegations of limitations associated with his impairment, and failed to explain her consideration of contradictory evidence in the record related to Plaintiff's credibility, reversal and remand are necessary. As suggested by the Commissioner, the ALJ's decision may be supported by substantial evidence. The Court, however, declines to speculate as to the ALJ's reasoning when the decision is devoid of the appropriate administrative analysis. The case, therefore, should be remanded for a proper analysis of Plaintiff's credibility.[7]

---

[7]By way of further example, the Court notes the ALJ failed to explain her consideration of the alleged side effects from Plaintiff's medications and their effects on his ability to sustain work. This discussion should be included after consideration on remand.

**Plaintiff's Remaining Arguments**

Because the Court finds the ALJ's failure to perform a properly credibility analysis is a sufficient basis to remand the case to the Commissioner, the Court declines to specifically address Plaintiff's additional allegations of error by the ALJ. However, upon remand, the Commissioner should take into consideration Plaintiff's remaining allegations of error.[8]

## <u>CONCLUSION AND RECOMMENDATION</u>

Wherefore, based upon the foregoing, it is recommended that the decision of the Commissioner be REVERSED and REMANDED for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

---

[8]Although not raised by Plaintiff, the Court notes the ALJ stated that her Listing analysis was consistent with the assessments of State agency psychological consultants Dr. Neboschick and Dr. Breslin. [R. 29.] However, it appears Dr. Neboschick's Psychiatric Review Technique was performed in November 2010 and considered only Plaintiff's diagnosis of Major Depressive Disorder, single episode, moderate and panic disorder without agoraphobia with respect to Listings 12.04 and 12.06. [R. 368, 371, 373.] Plaintiff's diagnosis of OCD, which the ALJ found to be severe, was not considered in Dr. Neboschick's listing analysis. Dr. Breslin, on the other hand, considered Plaintiff's diagnosis of Schizoaffective Disorder and OCD in her Listing analysis under 12.04 and 12.06. [R. 443–444.] The ALJ gave Dr. Neboschick's findings great weight, however, and gave Dr. Breslin's findings little weight as being overly optimistic. [R. 31–32.] It is unclear how the ALJ's analysis is consistent with both Dr. Neboschick's and Dr. Breslin's analysis. Further, it is unclear how Dr. Neboschick's findings deserve great weight when they do not contemplate all of the impairments the ALJ found to be severe.

Additionally, the Court notes that the ALJ failed to address a particular listing in finding that Plaintiff's back impairment did not meet the severity requirements of a listing and failed to explain her consideration of Plaintiff's severe and non-severe impairments in combination. On remand, the Commissioner should consider these issues as well.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

June 15, 2015
Greenville, South Carolina